ANDERSON FOWLER et al., Appellants, *v.* THE LIVERPOOL AND GREAT WESTERN STEAM COMPANY, Respondent.

Defendant contracted to transport on account of plaintiffs, "on board steamship *Minnesota* or *Nevada*, for Liverpool, three hundred bales of cotton." The cotton was then on its way from Mobile to New York, and the time of its arrival was uncertain. The *Minnesota* was advertised to sail October 27th, the *Nevada* a week later. The cotton was delivered at defendant's pier on October 26th; at that time defendant had a full cargo for the *Minnesota*, accepted and ready for loading; the cotton was therefore sent by the *Nevada*, and arrived at Liverpool a week after the *Minnesota*. Meanwhile, the price of cotton had fallen. In an action to recover damages for alleged breach of the contract, *held* the agreement was in substance, that if plaintiffs should deliver the cotton, in reasonable time for loading it on board the *Minnesota* before its sailing day, it should be carried on it, otherwise upon the *Nevada*; but that the cotton was not delivered within such reasonable time; that defendant was not required to reject other freight to reserve room for the cotton, and so take the chance of being compelled to sail without a full cargo in case of its non-arrival, but had the right to accept what was offered to make sure of a full cargo, and was only required to carry the cotton on the first

steamer if it was delivered on its pier before a sufficient cargo, accepted and ready for loading, was delivered; also, that defendant was not required to notify plaintiffs, on arrival of the cotton, that it could not go upon the *Minnesota.*

On arrival of the cotton upon the pier, defendant's agent gave receipts for it, each of which purported to be "memorandum of cargo on board steamship *Minnesota*." It appeared that these were intended simply as acknowledgments of delivery of the property, to be surrendered on delivery of the bills of lading, which constituted the contract of shipment. Bills of lading by the *Minnesota* were refused. *Held,* that the memorandum receipts did not vary the contract, or change the rights of the parties.

(Argued November 28, 1881; decided December 13, 1881.)

APPEAL from order of the General Term of the Supreme Court, in the second judicial department, made December 14, 1880, which sustained defendant's exceptions and granted a new trial (Reported below, 23 Hun, 196.)

This action was brought to recover damages for an alleged breach of a shipping contract.

The broker's memorandum of the contract between the parties was as follows:

"NEW YORK, *October* 14, 1869.

Engaged for account of Fowler Brothers, on board steamship *Minnesota* or *Nevada* for Liverpool, 300 bales of cotton at ½ *d.* per lb.

Pier 46, North river CARY & GALE.

Agents:
WILLIAMS & GUION,
71 Wall street."

At this time the *Minnesota* was advertised to sail for Liverpool from New York on the 27th day of October, 1869, and the *Nevada* on the 3d day of November, 1869; the cotton was on its way from Mobile, with the day of its arrival uncertain. It reached New York on the 23d day of October, and sixty-two bales of it were sent to Pier 46, North river, on the 25th day of October, and the remainder on the 26th. When the cotton reached the pier the defendant had cotton there more than sufficient to fill the *Minnesota*, engaged specially for that vessel, and

she sailed with a full cargo without the cotton of the plaintiffs. She arrived out on the 7th day of November. The cotton of the plaintiffs went on the *Nevada* on the 3d day of November, and she reached Liverpool on the 14th. Between the 7th and the 14th there was a fall in the market value of cotton. When the cotton was received at defendant's pier, its receiving clerk gave memorandum receipts therefor, of one of which the following is a copy:

WILLIAMS & GUION, Agents, No. 71 Wall street.

*Notice.*—Bills of lading will not be delivered until shippers furnish C. H. clearance and gross weight or gauge.

"NEW YORK, *October.* 26, 1869.

Memorandum of cargo on board steamship *Minnesota*, bound to Liverpool. For account of *Fowler Bros.*, marked *F. Red, ten bales cotton.*

R. A. WILLIAMS."

Williams was the receiving clerk of the defendant at the pier. On the day the steamer sailed, October 27th, the receipts were sent by plaintiffs to the office of Williams & Guion, with bills of lading for steamship *Minnesota*, to be signed on giving up the receipts; defendant's freight agent refused to sign the bills of lading, stating that the cotton was not on board. The plaintiffs then requested a return of the cotton that they might ship it by the Inman steamer, to which the agent replied, that it was already on the *Nevada*, and he could not give him an order.

*C. Van Santvoord* for appellants. The cotton having been delivered in time to go by the *Minnesota*, and having been receipted for, defendant could not claim the right to transfer it, to the *Nevada*. (2 Bacon's Abr. 443, Election, B; Chitty on Contracts, 729; citing Co. Litt. 145 *a; Hawcraft* v. *The Gt. Northern Ry. Co.*, 8 Eng. Law & Eq. 362; *Shelton* v. *Merchants' T. Co.*, 59 N. Y. 258, 263–4.) There is nothing in the circumstances of the case to discharge this obligation or to relieve the defendant from its liability, to respond in damages for

1881.] Fowler et al. v. Liverpool & Gt. West. St. Co.   193

Opinion of the Court, per Finch, J.

its breach. (*Butler* v. *Maples*, 9 Wall. 766, 773, 774; *Cliquot Champagne Cases*, 3 Wall. 115; *Smith* v. *North Hampton Bk.*, 4 Cush. 1–11; *Bk. of Vergennes* v. *Warren*, 7 Hill, 91; *Tierney* v. *N. Y. C. & H. R. R. R. Co.*, 76 N. Y. 306, 307, 308.) The right of action for injury for breach of contract in not taking the cotton on the *Minnesota* was not barred by plaintiffs' taking a bill of lading for the *Nevada*, whereby to obtain the delivery of their cotton from that vessel. (*Bowman* v. *Teal*, 23 Wend. 306; *Howe* v. *Oswego & S. R. R.*, 56 Barb. 121; *Allaire* v. *Whitney*, 1 Hill, 486, 488; *McKnight* v. *Dunlap*, 1 Seld. 544.) The measure of damages is the difference between the market value when the goods should have arrived, and the value at the time of their delivery, the carrier being liable to the extent of the depreciation. (*Ward* v. *The N. Y C. R. R. Co.*, 47 N. Y. 29, 32; *Collard* v. *South-eastern R. R. Co.*, 7 Hurlst. & Norm. 77.)

*John Nash* for respondent. The contract of the 14th of October gave defendant an election, whether to carry the cotton by the *Minnesota* or *Nevada*. (*McNitt* v. *Clark*, 7 Johns. 465; *Smith* v. *Sanborn*, 11 id. 59; 2 Pars. on Cont. 651.) The act of Williams in giving the receipt was not an exercise of the right of election by defendant. (*Boice* v. *H. R. R. R. Co.*, 61 Barb. 611.) The receipts given by Williams were not contracts; they were simply acknowledgments of the delivery of the cotton. (*Shelton* v. *Merch. Trans. Co.*, 59 N. Y. 258, 263–4.)

Finch, J. We are inclined to accept the plaintiffs' construction of the transportation agreement which has occasioned the present dispute. It seems to us reasonable and just, and most in harmony with the apparent intention and understanding of the parties. Upon that construction the contract was substantially that if the plaintiffs should deliver the cotton to the steamship company at its pier, in reasonable time for taking it on board the *Minnesota* before that vessel's sailing day, it should be taken to Liverpool upon that steamer; otherwise, upon the *Nevada*, advertised to sail a week later. This construction leaves open only the question whether, upon the un-

disputed facts, the cotton was presented for transportation within such reasonable time as to make it the defendant's duty to ship it by the *Minnesota*, or whether they were justified in loading it for a later departure by the *Nevada*. The advertised sailing day of the earlier steamer was October 27th. The engagement to transport the cotton was dated October 14th. At that date the cotton was on its way from Mobile to Savannah, by rail, and from the latter port by the steamer *Mercedita*. The period of its arrival at the port of New York was uncertain. Neither shipper nor carrier could accurately foretell such period. That uncertainty was the determining element in shaping the form and substance of the contract. It dictated its alternative character, and inwove itself into the texture of the agreement between the parties. On the one hand, it prevented the plaintiffs from absolutely agreeing to ship the cotton by the *Minnesota*. They could not wisely have made that agreement, and did not. If they had so contracted, the carriers could have relied upon it, and safely and prudently rejected other freight offered for shipment in order to reserve the necessary room. If for that reason compelled to sail without a full cargo, and so subjected to a loss of freight, their remedy would have remained against the shippers in default. But the same uncertainty which justifies the plaintiffs in not agreeing absolutely to furnish the cotton for the *Minnesota*, also justified its owners in not agreeing absolutely to carry it by that vessel. Clearly, they were under no obligation to reserve room for it at the peril of losing an equal quantity of freight. They were not bound to reject freight ready and offered on their pier upon the bare possibility that the cotton might come. They had the right to accept what was offered, as it came, and so make sure of a full and sufficient cargo. If the cotton came upon their pier while room was left — before a sufficient cargo, accepted and ready for loading, was proffered — they were bound to receive the cotton; but if, when it came, the cargo accepted and ready was complete, then they were not bound to carry it upon the *Minnesota*, but were at liberty to load it upon the *Nevada*. As matter of fact, the cotton

arrived upon the pier only the day before the *Minnesota* sailed. When it arrived, the proof shows, without dispute, that the cargo of that steamer was complete; that, in the usual and regular course of business, enough of freight had been already delivered and accepted, and was in the custody of the carrier for shipment, to fill out the steamer's load and leave no room for any thing more. For that reason we think the cotton was not offered as freight within a reasonable time. * It would be unreasonable to leave the shippers loose and hold the carriers fast. Their rights and duties should be measured by one and the same just standard. As the one was not bound to engage transportation upon an uncertainty, so the other was not bound to peril the loss of a full cargo upon the same uncertainty. What the latter could fairly do to save room for the cotton without danger of an incomplete load, it was their duty to do; but they were not obliged, on the day before the sailing of the vessel, to reject any part of the full cargo present and ready for shipment before the arrival of the cotton.

To this view of the rights of the parties, the learned counsel for the appellants makes a double answer. He says, first, that it was an indiscretion and fault of the defendants, that they engaged other cotton, by which the plaintiffs' cotton might be crowded out, without ascertaining whether the plaintiffs' cotton would be delivered for the *Minnesota*. But they had no means of ascertaining that fact in advance of its actual arrival. It was not expected that they should know until the bales came upon their pier. They were not bound to assume that it would come at all before the sailing day. Were they not at liberty, fairly, and in the usual and ordinary way, to accept the full cargo tendered on the dock, and in the press, and was it a fault or indiscretion to do so? We think not. To hold otherwise would work the injustice of requiring them to refuse freight offered and ready to be loaded upon the uncertain expectation of freight not arrived, and which possibly might not come at all. The second answer made has even less of justice in it. We are told that when the cotton arrived, and it became apparent that it could not go upon the *Minne-*

*sota*, the defendant should have so informed the plaintiffs, in order that the latter might have protected themselves from loss from a declining market, by arranging for shipment on some other steamer. This view of the contract seems to go upon the idea, that while it bound the carrier, it left the shipper free. By its terms, if the cotton did not come in reasonable time for the first vessel, which, as we have seen, actually happened, then it was to go on the second. The carriers loaded it on the *Nevada*, as had been agreed. They fulfilled their contract; were they bound to suspect that the shippers wanted to break it, and take room on some other vessel? The duty which the carriers owed was the duty which they performed. It was not needed, so long as they performed their contract, that they should tell the other party that they were doing it, least of all for the purpose of enabling such other party to repudiate his side of the agreement.

We have not overlooked the fact, which is pressed upon our attention, as tending to characterize, and even to modify the terms of the contract, that upon the arrival of the cotton upon the pier, it was received by an agent of the steamship company who gave receipts for it, each of which purported to be "memorandum of cargo on board steamship *Minnesota*." These receipts were shown to be merely acknowledgments that the property had passed into the custody of the carrier, and to be surrendered upon receipt of the bills of lading, which themselves constituted the contract of shipment. Bills of lading upon the *Minnesota* were refused; we do not think these memorandum receipts in any manner varied the contract or changed the rights of the parties; the fact they asserted was simply a mistake. They did not purport to substitute a new contract in the room of the old one. (*Shelton* v. *Merch. Dis. Trans. Co.* 95 N. Y. 263.) We think the case was properly decided by the General Term.

Order of the General Term affirmed, and judgment absolute for the defendant upon the stipulation granted, with costs.

All concur.

Order affirmed and judgment accordingly.